IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.  Case No. 3:16cr151

JOSE BENJAMIN
GUZMAN VELASQUEZ,

Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Jose Benjamin Guzman Velasquez's ("Guzman") Motion to Dismiss the Indictment, (the "Motion to Dismiss").[1] (ECF No. 12.) The United States responded to the Motion to Dismiss,[2] (ECF No. 15), and Guzman replied, (ECF No. 16). The Court held a hearing on the Motion to Dismiss on October 11, 2017. (ECF No. 17.) At the conclusion of the hearing, the Court denied the Motion to Dismiss, stating it would explain the rationale behind the denial in a forthcoming memorandum opinion. This Memorandum Opinion articulates the reasons that the Court denied Guzman's Motion to Dismiss. (ECF No. 12.)

---

[1] Guzman untimely filed the Motion to Dismiss, and contemporaneously filed an unopposed Motion for Court to Find Good Cause for Late Filing. (ECF No. 13.) The Court will grant this motion.

[2] In an apparent abundance of caution, on September 15, 2017, the United States filed a Consent Motion for Authorization to File Response to Motion to Dismiss on Monday, September 18, 2017. (ECF No. 14.) Federal Rule of Criminal Procedure 45 renders this motion unnecessary because, pursuant to Rule 45, any response filed by the United States would have been timely through Monday, September 18, 2017. Fed. R. Crim. P. 45(a)(1)(C) ("[I]f the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."). The Court will deny this motion as moot.

## I. Procedural Background

On December 6, 2016, the United States filed an Indictment against Guzman alleging one count: Illegal Reentry, in violation of 8 U.S.C. § 1326(a).[3] (ECF No. 1.) On May 31, 2017, Guzman was arraigned and entered a plea of not guilty, and the Court set a jury trial for August 2, 2017. (ECF No. 8.) On July 25, 2017, the parties filed a Consent Motion to Continue Jury Trial Beyond the Speedy Trial Act Cut-Off Date.[4] (ECF No. 9.) The Court held a hearing on the motion on July 28, 2017, orally granted it, and reset the jury trial for September 12, 2017. (ECF No. 10).

On September 5, 2017, Guzman filed the Motion to Dismiss, arguing that the Court should dismiss the indictment because Guzman's prior removal from the United States was

---

[3] Section 1326(a) provides in relevant part:

[A]ny alien who—

> (1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter
> (2) enters, attempts to enter, or is at any time found in, the United States, unless . . . prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission . . . shall be fined under Title 18, or imprisoned not more than 2 years, or both.

8 U.S.C. § 1326(a).

[4] Guzman attached a signed Waiver of Speedy Trial Act Cut-off Date with this motion. (ECF No. 9-1.) During oral argument, the parties represented that seventy (70) "countable" days had not yet elapsed on the speedy trial clock, and that, in any event, the waiver acted to toll any speedy trial calculation. (ECF No. 11.)
To the extent necessary, the Court formally grants the consent motion to continue. Moreover, given the legal issues raised by Guzman, "the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." *See* 18 U.S.C. § 3161(7)(A).

2

"constitutionally defective" and therefore could not serve as a predicate prosecution under 8 U.S.C. § 1326(a). (Mot. Dismiss 1.)

## II. Factual Background

Jose Benjamin Guzman Velasquez was born in El Salvador and is an El Salvadoran citizen. On December 31, 1998, at age 17, Guzman entered the United States over the U.S.-Mexico border by wading across the Rio Grande River. That same day, U.S. Border Patrol apprehended Guzman in Texas and initiated removal proceedings. In February 1999, approximately one month later, immigration officials released Guzman into the custody of an aunt who lived in California. The immigration court transferred venue of Guzman's removal proceedings to Los Angeles. Those proceedings ended approximately one year after his capture, in December 1999, when an immigration judge granted Guzman an order of voluntary departure.

The order of voluntary departure required Guzman to leave the United States of his own accord by March 30, 2000. If Guzman did not leave the country by March 30, 2000, the order of voluntary departure, by its own terms, immediately converted into an Order for Removal. Guzman did not voluntarily depart the United States on or before March 30, 2000. The March 2000 Order of Removal constitutes the only Order of Removal brought against Guzman.

In 2001, after a devastating earthquake in El Salvador, the Attorney General made Temporary Protected Status ("TPS")[5] available to El Salvadoran citizens. 66 Fed. Reg. 47,

---

[5] Temporary Protected Status is available to citizens of certain countries designated by the Secretary of Homeland Security (or, previously, the Attorney General) "due to conditions in the country that temporarily prevent the country's nationals from returning safely, or in certain circumstances, where the country is unable to handle the return of its nationals adequately." *Temporary Protected Status*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/temporary-protected-status. Once granted TPS, an alien is "not removable from the United States, [c]an obtain an employment authorization document (EAD), [m]ay be granted travel authorization," and "cannot be detained by DHS on the basis of

3

14214 (Mar. 9, 2001). To qualify, El Salvadoran applicants needed to show "'continuous[] physical[] presen[ce]' in the United States since March 9, 2001, and [must demonstrate] 'continuous[] reside[nce]' in the United States since February 13, 2001." *Id.*

On May 28, 2002, Guzman, through a retained attorney, applied for TPS with the United States Citizenship and Immigration Services ("USCIS"). (Stips. ¶ 2, ECF No. 18.)[6] Nearly a year later, on May 19, 2003, USCIS sent a letter to Guzman's attorney advising him of its intent to deny Guzman's TPS application because he had failed to provide sufficient proof that he had established a residence in the United States as of February 13, 2001, or that he had continuous presence in the United States since March 9, 2001. (Stips. ¶ 2; Stips. Ex. B, at 5.) The letter told Guzman that USCIS would "not make a final decision on [his] application for 30 days," and listed examples of acceptable evidence or documents he might seek to submit. (Stips. Ex. B, at 5.) USCIS also included notice that, "[i]f your response is not received by this office within thirty (30) days, [USCIS] will conclude that the application is not approvable and your application will be denied." (Stips. Ex. B, at 5.) While some notations in Guzman's A-file

---

his or her immigration status in the United States." *Id.* TPS is temporary and "does not lead to lawful permanent resident status or give any other immigration status." *Id.*

[6] In an effort to clarify what they characterized as a potentially confusing record, the parties proffered Stipulations at the outset of the October 11, 2017, hearing. (ECF No. 18.) While some stipulations present clear-cut facts that the Court can verify, other provisions summarize evidence that the parties did not present to the Court for review, and some rest on hearsay the Court might otherwise resist considering.
 As will be explained later, the most "summary" stipulations go to the core of Guzman's motion and the theory behind it. Without deciding the competence or admissibility of such evidence, the Court, in the interest of justice, incorporates information from the Stipulations into this decision so as to give Guzman a full hearing on the motion at bar.

suggest that his attorney sought additional time to respond to the May 19, 2003, letter, (*see* Stips. ¶ 3), neither Guzman nor his attorney responded to that letter.[7]

Key to the motion at bar, Guzman offers a stipulation that, "[p]rior to the 2003 letter," Guzman's A-file already contained what would have been acceptable documentation establishing residency and continuous presence for purposes of gaining temporary protected status.[8] (Stips. ¶ 3.) In his motion, Guzman highlights that USCIS failed to review the entire A-file when considering his TPS application. Guzman also emphasizes that his attorney did not tell USCIS about these documents or, perhaps worse, did not know they existed at all. The parties stipulated, without direct evidence from the (seemingly available) attorney himself, that Guzman's attorney "has no recollection of Mr. Guzman" or of representing him, and that the

---

[7] At oral argument, the parties read from case notes in the A-file suggesting that Guzman's attorney sought additional time to respond, but that he asked for that reprieve on June 30, 2003, beyond what would have been the thirty-day deadline. Regardless, no response was filed.

[8] Paragraph 3 of the Stipulations actually says that Guzman "had already provided to immigration officials information establishing residency and continuous presence as required under 8 U.S.C. § 1254a(c)(1), 8 C.F.R. § 244.2, and the applicable designation for citizens of El Salvador from the Attorney General of the United States." (Stips. ¶ 3.) The unwieldy aspect of the record from which the parties sought to spare the Court included the documents supporting this assertion. In his written motion, Guzman avers that the documents included a copy of his school identification card from the high school he had attended in California in 1999, "receipts showing a payment that he made to a travel agency in Richmond, Virginia in 2000," and "correspondence in 2000 showing that Mr. Guzman had established a residency in California." (Mot. Dismiss 2.)

Guzman presumably presents this information as foundation for a subsequent stipulated statement maintaining that, "had USCIS reviewed Mr. Guzman's entire immigration file when evaluating" his TPS application, "his application for temporary protected status should have been granted." (Stips. ¶ 3.)

Even with the input from a USCIS agent, as apparently happened here, the Court cannot see how the parties can stipulate to these legal findings, especially when the law requires that such determinations follow *agency* review. *See* 8 C.F.R. § 244.10(c)-(d) (outlining the administrative appeal process for challenging a denial of a TPS application). The Court weighs these stipulations accordingly.

5

"attorney has destroyed any files and documentation" that would have related to Guzman's TPS application. (Stips. ¶ 4.)

On April 5, 2004, USCIS denied Guzman's application for TPS in a letter sent to Guzman's immigration attorney. (Stips. ¶ 3; Stips. Ex. B, at 7.) Advising Guzman that no response to the May 2003 Notice of Intent to Deny had been placed in the record, the agency told Guzman that "the grounds for denial have not been overcome." (Stips. Ex. B, at 7.) The 2004 denial letter included a notice of the opportunity to appeal the decision and enclosed the I-290B form on which to do so. (*Id.*) The letter informed Guzman that any appeal had to be filed within thirty days, or the decision would be "final." (*Id.* at 8.)

Nearly three years later, on or about August 2007, Guzman entered state custody for an alleged misdemeanor violation that was subsequently dismissed. (Stips. ¶ 5.) Despite the dismissal, a fingerprint match identifying Guzman as an alien with an outstanding Order of Removal resulted in notification being sent to Immigration and Customs Enforcement ("ICE") Law Enforcement Support Center ("LESC") of his whereabouts. Using a Form I-205 Warrant of Removal/Deportation dated August 28, 2007, LESC placed a detainer on Guzman. (Stips. ¶ 5; Stips. Ex. C, at 1.) During the removal process, Guzman sought and received assistance from the El Salvadoran Consulate for travel documentation. (Stips. ¶ 5.)

On September 21, 2007, Guzman was physically removed from the United States. An ICE agent placed Guzman on a commercial flight departing from Dulles International Airport. (Stips. ¶ 6.) "Guzman never appealed or administratively challenged the removal." (Stips. ¶ 7.)

Guzman returned to the United States "sometime after September 21, 2007, without first obtaining the permission of the Attorney General or the Secretary of the Department of Homeland Security." (Stips. ¶ 8.) Guzman was convicted of three criminal offenses in Virginia

6

after 2007: (1) a 2012 misdemeanor Driving While Intoxicated ("DWI") offense; (2) a 2016 misdemeanor DWI offense; and, (3), a 2016 felony DWI offense. (Stips. ¶ 10.)

On October 1, 2016, a Grand Jury in the Eastern District of Virginia returned an Indictment for Guzman charging him with a violation of 8 U.S.C. § 1326(a). Guzman remained in state custody from some time in 2016 until he was turned over to immigration officials pursuant to an immigration detainer in May 2017. (Stips. ¶ 9.)

### III. Analysis: Motion to Dismiss

#### A. Statutory Framework of 8 U.S.C. § 1326

Broadly, 8 U.S.C. § 1326(a) makes it a crime for any alien "who has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding" to subsequently enter, attempt to enter, or at any time be found in the United States without advance permission from the Attorney General. Because a previous deportation order acts as an essential element of the Illegal Reentry offense, the Supreme Court of the United States has recognized that an alien can collaterally attack the constitutionality of the original deportation order in the later criminal proceeding. *See United States v. Mendoza–Lopez*, 481 U.S. 828, 838–39 (1987); *United States v. El Shami*, 434 F.3d 659, 663 (4th Cir. 2005). That is what Guzman attempts to do here.

Section 1326(d) places a limitation on collateral attacks of "the validity of the [underlying] deportation order" or proceedings, however, by requiring the alien to meet three criteria. 8 U.S.C. § 1326(d). An alien seeking to challenge a previous deportation proceeding must establish that: "(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and[,] (3) the entry of

the order was fundamentally unfair." 8 U.S.C. § 1326(d). A defendant must satisfy all three requirements to prevail. *United States v. Ortiz*, 488 F. App'x. 717, 717–18 (4th Cir. 2012). The defendant bears the burden of proof to establish the elements of a collateral attack under § 1326(d). *See* 8 U.S.C. § 1326(d) ("unless the alien demonstrates"); *El Shami*, 434 F.3d at 663 (stating that "the alien must demonstrate that" the three requirements of § 1326(d) have been met). If the defendant meets all three requirements, "the illegal reentry charge must be dismissed as a matter of law." *El Shami*, 434 F.3d at 663.

### B. The Parties Disagree as to What Deportation[9] Proceeding Guzman Challenges in his Motion to Dismiss

Before assessing the viability of the challenge, the Court must address the fact that Guzman and the United States do not agree as to what action he disputes, or can dispute. Guzman argues that § 1326(d) permits him to challenge the constitutional infirmities in his TPS application process. "In this case, the due process violation is the federal government's improper denial of Mr. Guzman's application for temporary protected status." (Mot. Dismiss 3.) Guzman essentially maintains that, *but for* the wrongful denial of his TPS application in 2002, "he would not have been subject to deportation at all" when he entered state custody in 2007. (Mot. Dismiss 3.) Given that USCIS had proper documentation to meet TPS application criteria, which they failed to review when he applied, Guzman contends that the denial of his TPS application violated due process. This is true, he suggests, in large part because his attorney rendered ineffective assistance of counsel by failing to identify, or re-send, the qualifying documents already in his A-File when USCIS sent Guzman its May 2003 Notice of Intent to Deny.

---

[9] The terms "deportation" and "removal" are used interchangeably by the parties.

Indeed, Guzman flatly disclaims any attack against his March 2000 Removal Order rather than the TPS application decision or proceedings. *See* Reply 2 ("Guzman is not challenging the 2000 order of removal.") Because the finding of TPS would have prevented USCIS from implementing the March 2000 Removal Order in 2007 when USCIS issued the Warrant for Removal, Guzman posits that the degree of error in the TPS proceeding deprived him of due process, and further, that this due process violation falls within the collateral constitutional challenge permitted under Section 1326(d). He confirmed that position at oral argument.

The United States argues to the contrary. Section 1326(d), it argues, pertains only to the challenge of a deportation or removal order—not the TPS proceeding Guzman seeks to contest here. In the case at bar, according to the United States, the only possible event to challenge would be the March 2000 Removal Order.[10] The United States avers that "[u]nless [Guzman] can meet the requirements of 8 U.S.C. § 1326(d)(1-3) . . . the motion to dismiss must fail." (Opp'n Mot. Dismiss 8.)

---

[10] Initially, the United States argued that, under Section 1326(d), Guzman should have collaterally attacked the August 28, 2007 Warrant of Removal. 8 C.F.R. § 241.2, which governs the issuance of warrants of removal, clearly articulates the relationship between removal warrants and removal orders, stating in part: "[a w]arrant of Removal, *based on the final administrative removal order* in the alien's case will be issued." 8 C.F.R. § 241.2 (emphasis added). Immigration officials issue a warrant based on a preexisting order of removal. The warrant is not itself an order.

During argument, the government conceded that, most likely, the 2007 Warrant simply served to execute the earlier March 2000 Removal Order. As a result, 1326(d) only would allow a challenge to the March 2000 Removal Order.

This difference is of no moment. Guzman affirmatively states that he does not challenge *any* deportation or removal order. And, at the very least, any challenge to the March 2000 Removal Order would fail the first prong of the 1326(d) three-part test: Guzman did not exhaust administrative remedies in the underlying proceeding. (*See* Stip. ¶ 7 ("Guzman never appealed or administratively challenged the removal.").) Perhaps because Guzman does not contest it, the record here remains remarkably bereft of details regarding the 2000 proceedings that resulted in the March 2000 Removal Order.

For the reasons explained below, the Court concludes that the relevant inquiry here surrounds whether the deportation proceeding that resulted in the issuance of the 2000 Order of Removal was flawed such that it violated Guzman's right to due process, as defined by § 1326(d). Guzman does not challenge the 2000 Order of Removal, (*see* Reply 2), so his collateral attack fails. Moreover, his attempts to expand existing law to allow review of his constitutional claim by this Court cannot prevail.

### C. Guzman's Attempt to Expand § 1326(d) and *Mendoza-Lopez* Beyond Collateral Attacks on Deportation Orders and Proceedings Falters

Guzman contends that § 1326(d) and *Mendoza-Lopez* apply to immigration decisions and processes other than deportation orders and proceedings. This arugment fails. Section 1326(d) refers only to deportation proceedings and orders. Section 1326(d) states, in relevant part: "In a criminal proceeding under this section, an alien may not challenge the validity of the *deportation order* . . . unless the alien demonstrates" that he or she exhausted administrative remedies related to "*the order*," that the "*deportation proceedings* at which the *order* was issued improperly deprived the alien of the opportunity for judicial review," and, that "the entry of the *order* was fundamentally unfair."[11] 8 U.S.C. § 1326(d) (emphasis added).

*Mendoza-Lopez* similarly applies only to deportation orders and proceedings. In his Motion to Dismiss and at oral argument, Guzman urges the Court to extend the holding of *Mendoza-Lopez* beyond deportation proceedings to encompass the sweeping proposition that "[t]he Supreme Court in *Mendoza-Lopez* clearly found that due process requires judicial review

---

[11] The Congressional Record also supports the conclusion that § 1326(d) applies exclusively to deportation proceedings and orders. *See* 104 Cong. Rec. S5558-01, S5571 (daily ed. May 11, 1994) ("[Section 1326(d) was] intended to insure that minimum due process was followed in the original *deportation proceeding* while preventing wholesale, time consuming attacks on underlying *deportation orders*." (emphasis added)).

10

of any administrative action that is a basis for a later criminal case." (Mot. Dismiss 5.) Guzman states:

> The *Mendoza-Lopez* Court did not specifically require the three-pronged test that Congress set forth in 8 U.S.C. § 1326(d) to challenge the validity of an underlying deportation order. Rather, Congress fashioned § 1326(d) in response to *Mendoza-Lopez* in the context of challenging underlying deportation orders. *Contrary to collateral attacks on deportation orders, for improper denials of temporary protected status applications, Congress did not require exhaustion of administrative remedies in order to seek temporary status protection under 8 U.S.C. § 1254a.*

(Mot. Dismiss 6 (emphasis added).) This argument is unavailing.

In *Mendoza-Lopez*, the Supreme Court articulated both the issue in that case and its holding in terms of deportation proceedings and nothing more. The *Mendoza-Lopez* court framed the issue before it as "whether a federal court must always accept as conclusive the fact of the *deportation order*, even if the *deportation proceeding* was not conducted in conformity with due process." 481 U.S. at 834 (1987) (emphasis in original omitted and emphasis added). Further, *Mendoza-Lopez* held that "[a] collateral challenge to the use of a *deportation proceeding* as an element of a criminal offense must be permitted where the *deportation proceeding* effectively eliminates the right of the alien to obtain judicial review." *Id.* at 849 (emphasis added). Nothing in the opinion suggests that the holding of that case extends any further than deportation proceedings and their accompanying orders. The Court sees no basis to so extend *Mendoza-Lopez*.[12]

---

[12] To support his broad interpretation, Guzman points to one line in *Mendoza-Lopez* that reads "'where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding.'" (Mot. Dismiss 3 (quoting *Mendoza-Lopez*, 481 U.S. at 837–38).) Guzman reads this language to mean that *Mendoza-Lopez* extends beyond deportation proceedings and orders. This argument, supported by a single line in a sixteen-page opinion in which all other statements speak to deportation proceedings, does not persuade.

11

Moreover, the United States Court of Appeals for the Fourth Circuit has expressly rejected the expansive reading of *Mendoza–Lopez* that Guzman urges this court to adopt. In *Smith v. Ashcroft,* the court noted that "while the *Mendoza–Lopez* Court admittedly espoused judicial review of administrative actions, the Court reasoned that review is essential when the outcome of the administrative proceeding is used as an element for criminal conviction. It is an overly expansive, and in fact, an incorrect, reading of *Mendoza–Lopez* to suggest that the Constitution requires 'meaningful review' of any and all administrative procedures." *Smith v. Ashcroft*, 295 F.3d 425, 431 (4th Cir. 2002). This Court agrees.

To the extent that Guzman asks this Court to find that, even outside his *Mendoza-Lopez* argument, the Court can review the denial of his TPS application, he cannot prevail. A denial of a TPS application is, of course, not an Order of Removal. Rather, it is merely the denial of an application for Temporary Protected Status, which is separate and apart from removal proceedings. Guzman does not attempt to characterize the denial of his TPS application as an Order for Removal but he also presents no persuasive reason why this Court should reach beyond the plain language of § 1326(d) or extend the holding of *Mendoza-Lopez* to include proceedings—such as the TPS application process—other than those for Removals Orders.

Moreover, Guzman has not identified—and the Court cannot find—any cases, binding or otherwise, concluding that a due process violation in the denial of a TPS application that post-

---

Even if the Court were to adopt Guzman's reading of *Mendoza-Lopez*, his argument likely would nonetheless fail. Although the outcome of a *deportation proceeding* may well play a critical role in the subsequent imposition of a criminal sanction—as was the issue in *Mendoza-Lopez*—the outcome of an application for TPS plays no such role here. Guzman's application for TPS post-dates the entry of his Order for Removal. The denial of his TPS application therefore, could not possibly have affected the deportation *proceeding* that resulted in the earlier Order of Removal. Moreover, even presuming Guzman's TPS application would have been granted, neither party asserts how that temporary protected status would have negated, withdrawn, or eliminated the March 2000 Removal Order.

dates an order for removal can be collaterally attacked under *Mendoza-Lopez* or § 1326(d). Therefore, the Court need not, and should not, reach the question of whether Guzman was denied due process in his TPS proceeding.

### D. Even if Denial of a TPS Application Could be Challenged under § 1326(d), Guzman Fails to Establish that This Court has Jurisdiction to Consider his Due Process Challenge

Even assessing what appears to be the thrust of Guzman's argument—a due process challenge to the denial of his TPS application—it appears that, as a threshold matter, Guzman cannot establish that the Court has jurisdiction to consider his claim. In fact, he suggests the opposite. In arguing that the denial of his TPS application meets the three requirements set out in § 1326(d), he asserts in a heading: "Judicial Review of Denial of Temporary Status Not Available."[13]

The decision to grant TPS, by statute, is discretionary, thereby depriving this Court of jurisdiction to review the denial of a TPS application. *See* 8 U.S.C. § 1254a(a)(1) ("[T]he Attorney General, in accordance with this section—(A) *may* grant the alien temporary protected status in the United States . . . ." (emphasis added)). Title 8 U.S.C. § 1252(a)(2)(B) states in relevant part: "no court shall have jurisdiction to review. . . (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the *discretion* of the Attorney General or the Secretary of

---

[13] In the same section, however, Guzman also contends that *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), provides the basis for judicial review because "due process protects the application and review process for status within the United States." (Mot. Dismiss 10.) This argument founders as *McNary* is inapplicable to Guzman's case. Not only did the *McNary* court limit its holding to the Special Agricultural Worker's (SAW) amnesty program, *see McNary*, 498 U.S. at 483 ("This case relates only to the SAW amnesty program"), it also dealt with the jurisdiction-stripping provisions in 8 U.S.C. § 1160(e), an entirely different provision within the Immigration and Nationality Act than that which proscribes jurisdiction of courts to review denials of TPS applications.

13

Homeland Security, other than the granting of relief under section 1158(a) of this title." 8 U.S.C. § 1252(a)(2)(B); *see also Kucana v. Holder*, 558 U.S. 233, 233, 248-49 (2010) (holding that § 1252(a)(2)(B)'s limit on judicial review applies only to Attorney General decisions that are made discretionary by statute, and not through regulation). Indeed, one court in this district has expressly found a lack of jurisdiction to review denials of TPS applications. *See Rodas v. Chertoff*, 399 F. Supp. 2d 697, 705 (E.D. Va. 2005) ("Given this statutory and regulatory framework, it is clear that there is no jurisdiction in this or any court to review the claims of the fifteen plaintiffs who were denied and never received TPS.").

The carve-out exception allowing judicial review of constitutional claims does not cure Guzman's jurisdictional woes because he brings his challenge in the wrong court. 8 U.S.C. § 1252(a)(2)(D) provides:

> Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

8 U.S.C. § 1252(a)(2)(D). Even if the exception were to apply in Guzman's case, he has brought the Motion to Dismiss in a district court, not the "appropriate court of appeals."[14]

---

[14] During oral argument, counsel for Guzman contended that his appeal to the Circuit Court should be excused because of alleged ineffective assistance of counsel from the attorney he retained to assist him in applying for TPS. Guzman confuses the issue. The Court does not need to address whether Guzman's failure to appeal the denial of his TPS application in 2002 was excused by ineffective assistance of counsel. The question before the Court is whether or not, in 2017, the Court can review Guzman's denial of his TPS application in a collateral attack to his indictment for a violation of § 1326(a). This Court lacks jurisdiction to answer that question.

### E. Guzman's Collateral Attack Fails Because He Has Not Met His Burden in Challenging His 2000 Removal Proceeding

To mount an effective collateral attack under § 1326(d), Guzman must challenge a deportation proceeding or order. The only deportation order on the record against Guzman is the 2000 Order of Removal. As stated above, Guzman affirmatively states that "[he] is not challenging the 2000 order of removal." (Reply 2.) Guzman bears the burden of establishing the elements of a collateral attack under § 1326(d). *See* 8 U.S.C. § 1326(d) ("unless the alien demonstrates"); *El Shami*, 434 F.3d at 663 (stating that "the alien must demonstrate that" the three requirements of § 1326(d) have been met). Because Guzman does not challenge his 2000 Order of Removal, he has not met his burden to show the first of the three requirements under § 1326(d). Therefore, his collateral attack fails.

## IV. Conclusion

For the foregoing reasons, the Court will deny Guzman's Motion to Dismiss. (ECF No. 12.) An appropriate Order shall issue.

It is so ORDERED.

/s/
M. Hannah Lauck
United States District Judge

Date: 10-20-17
Richmond, Virginia